Jochec v. Clayburne 



IN THE COURT OF APPEALS, THIRD DISTRICT OF TEXAS,



AT AUSTIN




 



ON MOTION FOR REHEARING


 






NO. 3-92-113-CV






JANICE SUE JOCHEC, JAYNE E. JOCHEC, MELVIN M. JOCHEC,


JOCHEC, JOCHEC & JOCHEC, P.C., AND NEWTEX INVESTMENTS,



 APPELLANTS


vs.





DIANA CLAYBURNE AND SUSAN KARGER,



 APPELLEES



 




FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT



NO. C91-16A, HONORABLE FRED A. MOORE, JUDGE PRESIDING



 






 The opinion and judgment issued herein by this Court on June 9, 1993 are
withdrawn, and the following opinion is substituted in lieu of the earlier one.

 Diana Clayburne and Susan Karger (collectively, "Plaintiffs"), appellees and
beneficiaries under trusts created by their father, Lawrence Wehe, sued Janice Sue Jochec; Jayne
E. Jochec; Melvin M. Jochec; Jochec, Jochec & Jochec, P.C. ("Jochec, P.C."); and Newtex
Investments (collectively, "the Jochecs"), appellants. Plaintiffs alleged that Janice breached her
fiduciary duties while acting as trustee under the trusts created by Wehe and that the remaining
appellants conspired with Janice to breach her fiduciary duties. Trial was to a jury, which found
in favor of Plaintiffs. Based on the jury's findings, the trial court awarded Plaintiffs a total of
$270,000 in actual damages and $700,000 in exemplary damages. In three points of error, the
Jochecs complain that the trial court submitted an erroneous jury charge and erred in awarding
exemplary damages. We will reverse the judgment of the trial court and remand the cause.



FACTUAL AND PROCEDURAL BACKGROUND


 In the early 1980s, Wehe decided to develop ranch land he owned in Comal
County. After entering into a development agreement with Gordon Sutton, Wehe consulted his
accountant, Janice Jochec, for advice in structuring an arrangement whereby he would receive
income for life from the development project and his daughters, Diana and Susan, would receive
the remainder at his death.

 To facilitate Wehe's plan and with Wehe's knowledge, Janice formed a corporation
named "Su-Anna, Inc." and appointed herself as president. Su-Anna purchased parcels of the
ranch land from Wehe. Wehe financed these purchases, which were secured by a note and deed
of trust on the land. At the same time, Wehe executed a trust instrument creating the Diana Lynn
Wehe Trust and the Susan Loraine Wehe Karger Trust (hereinafter "the trusts") and named Janice
as trustee. Diana and Susan were sole beneficiaries under the trusts. Each trust held one-half of
Su-Anna's corporate stock.

 The land was subdivided, and Sutton began developing and selling individual lots. 
Sutton and Su-Anna financed these sales. Pursuant to the development agreement, Sutton received
a one-half interest in the notes for all property sold in the subdivision, and Su-Anna received the
other one-half interest. In addition, Sutton was responsible for all development and management
obligations, including payment of property taxes. Su-Anna's only financial obligation was the
first lien mortgage in favor of Wehe.

 In 1986, problems surfaced. As the entire state witnessed an economic downturn,
Sutton experienced financial difficulties and was unable to meet many of his financial obligations. 
Sutton failed to pay property taxes in 1985 and thereafter. Janice set up a "phased buy-out" of
Sutton's one-half interest in the development notes, which was financed by Newtex. Newtex was
a partnership of Janice, Jayne, and Melvin Jochec that solicited private investment in various
business ventures. The buy-out was negotiated by Janice on behalf of Su-Anna, and by Melvin
on behalf of Newtex. The uncontroverted testimony presented at trial by Janice and by Carter
Casteel, an attorney who participated in drafting several of the conveyance instruments,
established that Wehe had full knowledge of the buy-out transaction. Janice testified that she
reviewed the transaction with Wehe "in great detail" and that "[h]e knew who was participating
and to what extent." When Casteel was asked whether Wehe "knew about problems and what
decisions you all were having to make in regards to Gordon Sutton," e.g., the buy-out transaction,
she responded, "As far as I know he did." Further, Casteel testified that she spoke several times
with Janice, Sutton, and Wehe regarding the transaction and that "[f]inally we just did it. 
Lawrence [Wehe] knew about it." Pursuant to this buy-out agreement, Newtex was given an
interest in the development notes; Newtex received a percentage interest in addition to a carried
interest for providing funds for the buy-out; Su-Anna was required to guarantee the development
notes purchased from Sutton; Su-Anna was required to pay a monthly collection fee to Newtex;
Su-Anna was required to pay all marketing and development expenses for the project; Su-Anna
was required to pay all accounting fees of Jochec, P.C. (which had served as Su-Anna's
accounting firm during all times Janice controlled Su-Anna and the trusts); and Su-Anna was
required to pay $135,000 in delinquent property taxes (which were ultimately paid in 1989
through funds loaned by Newtex).

 Only after Wehe's death did Diana and Susan discover that their father had created
the trusts. After several meetings with Janice, Diana and Susan filed suit against Janice and the
other Jochecs alleging breach of fiduciary duties and conspiracy. The jury found in favor of
Plaintiffs, and the trial court rendered judgment that Plaintiffs recover $270,000 in actual
damages: $135,000 related to property taxes paid by Su-Anna, $100,000 related to Newtex's
involvement in the purchase of the development notes, and $35,000 related to professional fees
paid by Su-Anna. In addition, the trial court awarded $700,000 in exemplary damages: $100,000
against Janice, $100,000 against Melvin, $300,000 against Newtex, and $200,000 against Jochec,
P.C.



JURY CHARGE


 In their first point of error, the Jochecs complain that the trial court erred in
submitting the charge to the jury by failing to instruct the jury that, when a trust agreement
modifies the duties imposed on a trustee by statute or common law, the trustee's duties are
thereafter governed by the terms of the trust instrument.

 The trial court instructed the jury that Janice was charged with five specific duties
as trustee: (1) the duty not to self-deal, (2) the duty of fidelity, (3) the duty to exercise reasonable
care and skill, (4) the duty to preserve trust property, and (5) the duty to enforce claims of the
trust. In connection with the listing of these duties in the charge, the trial court gave the jury the
following additional instruction:



[I]n acquiring, investing, reinvesting, exchanging, retaining, selling, supervising,
and managing trust property a trustee shall exercise the judgment and care under
the current circumstances that persons of ordinary prudence, discretion, and
intelligence exercise in the management of their own affairs, not in regard to
speculation but in regard to the permanent disposition of their funds, considering
the probable income from as well as the probable increase in value and the safety
of their capital.



The Jochecs do not dispute that the five duties would be applicable absent a contrary provision
in the trust instrument. Rather, the Jochecs complain that the trust instrument does contain
contrary provisions and that the trial court erred in failing to instruct the jury that Janice's duties
as trustee were effectively modified by those provisions. Specifically, the Jochecs requested that
the trial court's additional instruction, quoted above, be prefaced by the clause, "Unless the terms
of the trust instrument provide otherwise . . . ." The Jochecs argue that the trial court's failure
to include this clause was harmful error because the terms of the trust instrument modified some
of the duties identified by the court in the charge. (1)

 We must first determine whether the trust instrument did in fact waive or modify
any of the duties applicable to Janice as trustee, thereby providing a reason for an instruction that
Janice's duties were governed by the trust instrument. Accordingly, we must review the duties
identified in the jury charge in light of the specific provisions of the trust instrument.

 The trial court defined the duty of fidelity (sometimes referred to as the duty of
loyalty) as "the duty that the trustee has that forbids the trustee from placing herself in a situation
where there is or could be a conflict between her interest and her duty to the beneficiaries." 
Plaintiffs alleged at trial that Janice breached this duty and created a conflict of interest by acting
as trustee of the trusts while, at the same time, providing accounting services for Su-Anna through
her firm, Jochec, P.C., and negotiating business transactions with Newtex, a partnership in which
she was a designated general partner.

 In response, the Jochecs contend that an exculpatory provision in the trust
agreement modified the duty of fidelity by authorizing Janice to "engage in and carry on any
business or undertaking . . . with any person, firm, corporation or any trustee under any other
trust." (Emphasis added.) In other words, the Jochecs contend that the broad language of the
trust instrument entitled Janice to engage in business with any entity; that she was not limited by
such language with respect to entities with which she could transact business; and that,
accordingly, she was entitled to transact business with entities in which she had an ownership
interest or was otherwise involved. Plaintiffs, on the other hand, contend that such language was
not specific enough to modify the duty of fidelity. Because the language is broad enough to
reasonably support the Jochecs' interpretation, yet not specific enough to provide a clear
indication of the intention of the parties to the instrument (Janice as trustee and Wehe as settlor),
we conclude that the quoted provision is ambiguous. Accordingly, we must look beyond the four
corners of the document to discern the proper construction of the provision. Where a question
relating to the construction of a contract is presented, we must consider the wording of the
instrument in light of surrounding circumstances, apply appropriate rules of interpretation, and
settle the meaning of the contract. Harris v. Rowe, 593 S.W.2d 303, 306 (Tex. 1979). 

 We first consider the parties' actions and conduct after the execution of the trust
instrument, in order to determine the interpretation placed on the instrument by the parties
themselves. See Consolidated Eng'g Co. v. Southern Steel Co., 699 S.W.2d 188, 192-93 (Tex.
1985). As the Texas Supreme Court has stated, 



No principle of interpretation of contracts is more firmly established than that
great, if not controlling, weight should be given by the court to the interpretation
placed upon a contract of uncertain meaning by the parties themselves. Courts
rightfully assume that parties to a contract are in the best position to know what
was intended by the language employed. The court should adopt the construction
of the instrument as placed upon it by the parties unless there is clear language in
the instrument indicating an intention to the contrary.



Harris, 593 S.W.2d at 306 (citations omitted); accord James Stewart & Co. v. Law, 233 S.W.2d
558, 561 (Tex. 1950); Lone Star Gas Co. v. X-Ray Gas Co., 164 S.W.2d 504, 508 (Tex. 1942);
Col-Tex Ref. Co. v. Coffield & Guthrie, Inc., 264 S.W.2d 462, 466 (Tex. Civ. App.--Eastland
1954, writ ref'd); see also Young v. Fitts, 183 S.W.2d 186, 190 (Tex. Civ. App.--Fort Worth
1944, writ ref'd w.o.m.) ("the construction given [the contract] by the parties themselves
furnishes the highest evidence of their intention"); Page v. Superior Stone Prods., Inc., 412
S.W.2d 660, 664 (Tex. Civ. App.--Austin 1967, writ ref'd n.r.e.) ("the construction given the
contract by the parties and their actions under the contract, before any controversy arose as to its
meaning, with knowledge of its terms, will be adopted and enforced by the courts when
reasonable").

 The uncontroverted testimony presented at trial established that Wehe had full
knowledge of the "conflicts of interest" identified by Plaintiffs. Janice, through Jochec, P.C.,
served as Su-Anna's accountant while also serving as trustee under the trust instrument with
Wehe's knowledge and consent until such time as the present dispute arose. No evidence was
presented indicating that Wehe objected to Janice's serving in this dual capacity. Further, with
regard to the Newtex buy-out transaction, Janice testified that she reviewed the transaction with
Wehe "in great detail" and that "[h]e knew who was participating and to what extent." Casteel,
an attorney who participated in drafting several of the conveyance instruments, testified that Wehe
was informed as to the details of the buy-out transaction; she spoke several times with Janice,
Sutton, and Wehe regarding the transaction and "Lawrence [Wehe] knew about it." The record
contains no indication that Wehe objected to Newtex's involvement in the buy-out transaction or
that he objected to the terms of the buy-out. Based on this direct, uncontroverted evidence, we
conclude that Wehe's acts and conduct with respect to the "conflicts" identified by the Plaintiffs
indicate that he interpreted the broad language in the trust instrument as allowing Janice, as
trustee, to transact business with entities with which she was involved, through an ownership
interest or otherwise. In other words, based on Wehe's acts and conduct, we conclude that he
intended the language used in the trust instrument to modify the duty of fidelity.

 It has been stated that, as a general rule of construction, exculpatory provisions
included in trust instruments are strictly construed, and "the trustee is relieved of liability only
to the extent to which it is clearly provided that he shall be excused." Jewett v. Capital Nat'l
Bank, 618 S.W.2d 109, 112 (Tex. Civ. App.--Waco 1981, writ ref'd n.r.e.); see also Price v.
Johnston, 638 S.W.2d 1, 4 (Tex. App.--Corpus Christi 1982, no writ) ("When a derogation of the
[Texas Trust] Act hangs in the balance, a trust instrument should be strictly construed in favor
of the beneficiaries"). We believe, however, that this strict-construction rule should be applied
only in circumstances where the intention of the parties cannot be discerned from the parties'
actions or conduct. We reach this conclusion because, as indicated above, evidence of the parties'
own interpretation of the instrument furnishes "the highest evidence" and is accorded "great, if
not controlling, weight." A strict-construction rule, on the other hand, like other general rules
of construction, is necessarily arbitrary and should be used only as a "tie-breaker" where more
direct evidence does not resolve the ambiguity: "[A] rule of construction in law does not overrule
or supersede the intention of the parties to the contract." Allied Chem. Corp. v. American Indep.
Oil Co., 623 S.W.2d 760, 763 (Tex. App.--Houston [1st Dist.] 1981, writ ref'd n.r.e.) (refusing
to apply rule of expressio unius est exclusio alterius). Because we have concluded that the
evidence bearing directly on Wehe's intent resolves any ambiguity in the language used in the
trust instrument, we decline to apply the strict-construction rule referenced above. 

 Based on the foregoing analysis, we conclude, in light of the parties' acts and
conduct, that the parties intended the provision at issue to modify the duty of fidelity. 
Accordingly, we conclude that the trial court erred in failing to instruct the jury that Janice's
duties as trustee were governed by the terms of the trust instrument. In light of our conclusion
that the trial court erred with respect to its instruction regarding the duty of fidelity, we need not
address whether the trust instrument modified the remaining duties.

 We next address whether such error constitutes harmful error, i.e., whether the
trial court's failure to instruct the jury as to the modified duty of fidelity "was reasonably
calculated to cause and probably did cause rendition of an improper judgment." Tex. R. App. P.
81(b)(1). Our review of the record in the present case reveals that the duty of fidelity and the duty
not to self-deal were the dominant themes throughout the trial. (2) The vast majority of the evidence
presented involved Janice's "conflicts of interest" and her alleged profiting as a result of such
conflicts to the detriment of Plaintiffs. 

 The duty of fidelity and the duty not to self-deal are substantially related. In fact,
we have difficulty imagining how the duty not to self-deal could be violated without a threshold
violation of the duty of fidelity. By the very nature of the act, a trustee may self-deal (profit to
the detriment of the beneficiaries) only by asserting the trustee's own interest before that of the
beneficiaries. In order to assert the trustee's own interest over the beneficiaries, however, a
conflict of interest must first exist. Thus, although the Jochecs apparently concede that the duty
not to self-deal was not modified, and our review of the record indicates that there was ample
evidence of self-dealing, the interrelated nature of these two duties requires us to determine
whether the trial court's error with regard to the duty of fidelity probably caused the rendition of
an improper judgment, notwithstanding the evidence regarding self-dealing.

 Janice testified that she understood the trust instrument to allow her to engage in
transactions involving conflicts of interest, and she freely admitted that she consciously engaged
in such transactions, specifically serving as Su-Anna's accountant through Jochec, P.C. and
negotiating the terms of the Newtex buy-out. Janice testified as follows:



Q. You knew as early as 1982 that as a trustee you were prohibited from any
type of self-dealing that would cause harm to Diana and Susan, didn't you?


A. It was setup to have self-dealing [conflicts] because we were to be the
account[ant]s. 


. . . .


Q. Okay. Were you aware about the prohibition against conflicts of interest
in 1982?


A. Yes.


Q. Were you aware of the rules against conflict of interests in 1986?


A. Yes. 


Q. And it was in 1986 that you first engaged in these transactions [the initial
Newtex buy-out] that involved a conflict of interest, is that correct?


A. Yes.


. . . . 


Q. In 1986, when you were engaged in the conflict of interest, did you
understand that you had an obligation to put the interest of Diana and Susan
ahead of your own personal interest?


A. Yes. And that's what was done.


Q. The conflict of interest didn't end in 1986, did it?


A. It continued.


Q. It continued up to the time Lawrence Wehe died, didn't it?


A. Yes.



 The jury was instructed that Janice, as trustee, was charged with a common-law
duty of fidelity, unrelaxed and unmodified by the trust instrument. Based on Janice's unequivocal
admission that she intentionally and knowingly engaged in transactions involving conflicts of
interest, the jury instructions left the jury no choice but to find that Janice, as trustee, had
breached her duty of fidelity. Likewise, the jury had no choice but to find that Janice intentionally
breached that duty, a prerequisite to an award of exemplary damages. Based on our review of the
record, it appears to us that if the jury had been instructed that Janice's duties, including the duty
of fidelity, were governed by the parties' trust agreement to the extent that instrument modified
her duties, the jury probably would have reached a different verdict as to exemplary damages. 
We conclude, therefore, that the trial court's failure to properly instruct the jury with regard to
the duty of fidelity was reasonably calculated to cause and probably did cause rendition of an
improper judgment, at least with respect to exemplary damages. This harm necessarily taints the
judgment against all the Jochecs, not solely that against Janice.

 We sustain the Jochecs' first point of error. Having sustained that point, we need
not reach points of error two and three.


CONCLUSION


 Because we conclude that the error in the charge probably caused the rendition of
an improper judgment, we reverse the trial court's judgment and remand the cause for further
proceedings.



 

 J. Woodfin Jones, Justice

Before Chief Justice Carroll, Justices Jones and Kidd

Reversed and Remanded

Filed: September 15, 1993

Publish
1.   Plaintiffs contend that the Jochecs have waived their right to appeal any error in the
court's charge because they failed to properly object to the jury charge and, further,
failed to request an instruction in substantially correct form. Our review of the record
indicates that the Jochecs sufficiently preserved error through their objections and their
submitted request. Accordingly, we will address the merits of the Jochecs' complaint.
2. In the jury charge, the trial court defined self-dealing as an occurrence in which
"the trustee has used the advantage of her position to gain any benefit for the trustee,
other than reasonable compensation as trustee, or any benefit for any third person, firm,
corporation, or entity at the expense of the trust and its beneficiaries." The Jochecs do
not dispute the accuracy of this definition and concede that "[t]he jury was properly
instructed that Jan Jochec had a duty not to self-deal."


 Although the Jochecs conceded this point, Plaintiffs have argued in their
brief to this Court that the duty not to self-deal can never be waived "because to do so
would be contrary to public policy," citing InterFirst Bank Dallas, N.A. v. Risser, 739 S.W.2d
882, 888 (Tex. App.--Texarkana 1987, no writ). In an amicus curiae brief submitted by the
Texas Academy of Probate and Trust Lawyers, the Academy contends that Risser does not
stand for this proposition. We note initially that Risser involved a corporate trustee, which,
by statute, cannot be relieved from liability for engaging in certain self-dealing transactions. 
Tex. Prop. Code Ann. § 113.059(b) (West 1984). Further, after a careful reading of the
Risser case, it appears that the holding in that case could be interpreted as simply standing for
the proposition that the duty not to self-deal cannot be modified so as to allow a non-corporate
trustee to self-deal in bad faith (or with reckless indifference), rather than the proposition that
the duty not to self-deal can never be modified at all. Cf. Restatement (Second) of Trusts
§ 170 cmt. t (1957). However, in light of the Jochecs' concession that this duty was not
modified in the present case, we need not decide this issue.